to face them? No, because then we won't be able to hear you. So just speak up, because otherwise we won't be able to hear what you're saying. All right, I appreciate it. And I intend to reserve some time for rebuttal. I understand we have 15 minutes. This is a false claims act case. We allege that it is a billion-dollar fraud against the state of officials and MERS, the largest shipper in the world. We believe that there was a project authorized to build an artificial island in the port of Los Angeles for a billion dollars in state trust funds were going to be used, plus $100 million in federal funds were going to be used to build this 500-acre island to both house, hazard, and protect the island from hazardous waste and take it away from the communities of San Pedro and also to have the other half being used for multi-user container traffic. So the federal interest was twofold, one to protect the public and also to promote interstate commerce. We believe that there was a bait and switch, that the false claims were submitted by the port of Los Angeles on behalf of itself and MERS to get these funds when they never intended to build the project that was authorized by Congress. I am here today just to give the students a little relater lesson. I can't quote the entire Latin of Kitam, but bottom line is, I'm representing a whistleblower here today on behalf of the state of California and the United States, Stanley Mosler, who basically discovered this rampant fraud. And under the false claims act, individuals like Stanley Mosler can serve as private attorneys general and bring fraud to court on behalf of the governmental entities to recoup the stolen funds. Counsel, let me ask you about one of the aspects of the case that concerns me from your client's point of view. One of the statutory requirements under both federal and state law is that a even assuming you get to the last part of the analysis, your client has to be the original source of the information in order to have the opportunity to bring this case. It's a jurisdictional requirement. The district court found as fact that the information your client had and that he alleges in this lawsuit came from a variety of other sources. He learned it from the newspapers. He learned it from government reports, from the court itself and from the Army Corps of Engineers. Why are those findings of the district court about the source of his knowledge clearly erroneous? Well, first of all, I don't believe that the district court found that he based his fraud case under the False Claims Act on newspaper reports. I believe the court rejected that notion, finding that the media reports did not trigger public disclosures. The district court's ruling... I think the court, I may be mistaken about this, but I thought that the court found that the change in use issue was one that he learned from reading about it in the media initially and or from materials disclosed by the port and by the Army Corps of Engineers. I believe, originally the court found there was no public disclosure in its original ruling, but then it granted Mursk's motion for reconsideration and basically found public disclosure based solely on a report provided by Mr. Mosler to the Corps of Engineers in January 2009. I'm not asking about public disclosure. I'm asking about originating source. That's a different analytical point. In other words, if he just collected information from various places and was the first person to say, oh, look at that. Isn't that interesting? I'm going to now make a claim based on all this information I've gathered from somewhere. That's an original source problem and that's what I'm trying to get at here because that would do him in regardless. Thank you. And it's a direct and independent knowledge issue for original source. Right. Assuming there's a public disclosure, you go to original source. Right. That's why I went there. Okay. Two points. One, you raise an issue that the district courts actually, it's a framing issue. What is the fraud here? It's not the fact, and we all know it, we can go down to the port and see that Mursk has this mega terminal and there's no hazardous waste disposal on that island and we can all read the newspaper and see that, well, it was supposed to have some hazardous waste material disposal there but no longer does and it's a big Mursk facility. We can all see that. We can read the papers. We can go and look at it. That's not the fraud here. The fraud is lack of government approval, lack of congressional approval to change the deal. That was never disclosed. That was never disclosed in the public and Mr. Mosler, through tenacious, painstaking, time-consuming investigation, found that that was the fraud. That's the false claim. So that's why it matters to you. You're saying that whether the written testimony to the port or to the Army Corps of Engineers was a public disclosure or not because he did precisely make the allegations in that document. Well, yes, and we can get to whether that was actually, and that would go to the public disclosure aspect and we say that ultimately it wasn't because that is the narrow read on which the district court found public disclosure. I think it was based on a misunderstanding of that specific exhibit. Misunderstanding in what way? It seems to me that that written testimony did contain the bait and switch allegations. So do you agree with me so far? It does. Okay. So in what way did the district court misunderstand the document? The district court, we're now going back to public disclosure. Correct. Thank you. And I actually want to put a pin and I want to also answer, there's one other original source point about reliance on documents and that's okay. I want to get to that point as well. But going back to public disclosure and this Exhibit 86 upon which the district court found public disclosure, it was, Mr. Mosler went to talk to the Corps of Engineers in January 2002, two months before he filed. He had some written statements and he knew he only had a little time. He didn't read the bait and switch stuff into the record, but he had a copy of it and he gave it to an Army Corps of Engineers representative. That submission to this Army Corps of Engineers representative is not a public disclosure. It might have become a public disclosure if it was put on websites or some type of publication of that. It was never done. That never happened. It was not read into Mr. Mosler's statement to the Army Corps of Engineers during that public hearing. So it wasn't even, it was never publicly disclosed. But more importantly- What did it say? It essentially says you need to look into the Pier 400. There was a cover-up. There was, they breached these underlying agreements, these congressionally approved agreements because they were supposed to basically put substantial acreage for hazardous waste disposal on this island. They never did that. Look into that. That was not part of his oral testimony. That's undisputed. It was in his statement that he ultimately, after his time was up, he gave it to the Army Corps of Engineers representative, Mr. Burnham. That document never made its way into any public record. So there was never a public disclosure. And more importantly, to become an original source, obviously whistleblowers have to first go to the government before they file their whistleblower complaint and say, here's what I got. So that the act, there's no precedent showing that the act of going to the government, in this case the only trigger per the district court's ruling, was a disclosure to the government. But that's an original source obligation. Well, let me ask you this. Who was in, the Corps of Engineers was overall in charge of how this construction project was ongoing? Because you need somebody on the job every day on a huge project like this to see that the plans and specifications and all that are complied with, right? Correct. All right. So that was the job of the Army Corps of Engineers. They're part of the executive branch to actually Well, I know who they are. No, build the project. Yeah, they represent the government. Yes. Yeah, they're looking out for the government's money. And they want to make sure that it's built according to the plans and the specifications and that the congressional purpose is served. And so you're saying that while this project was under construction, that the Army Corps of Engineers had no idea that the facilities for handling toxic waste were not being built? Is that what you're saying? Were they on the plans? Excuse me? I mean, when we talk about this project, you have plans, right? Yes, there were plans. Were they toxic disposal apparatus? Were they on the plans? Yes, they were. They're not a watchdog group, nor do they have the power to approve a materially different project, which I don't think anyone disputes. Well, I didn't say that. Right, no. You're asking about their knowledge. Well, no, they're supposed to be on the job. They look at the plans and specifications, and they make sure that this project is being built according to those plans. Isn't that what they do? Not necessarily. Well, what do they do then? They help implement... They were not on the job building the project. They have someone on every project where it puts in big money to see to it that the money is spent as the government, as Congress wishes. And they look at the plans, like when this building went up. We had a private contractor, but we had someone from GSA here every single day looking at everything that went on. That is not their role. So what is their role? The Army Corps of Engineers is basically, per court directive, to oversee what is happening. There's no person at the Army Corps of Engineers saying, okay, here's the specifications, and here's what the authorized private engineers said. No, they don't do that. They just check to see. There is no... To see if the work is being done properly. There is no... The Port of Los Angeles basically is coming to them with revised projects. And the Army Corps of Engineers, there's no evidence that they were going back and saying, you know what? That doesn't comply with this original congressionally approved project. They were not doing that. They're not that type of watchdog group. And in fact, they don't have the power under the federal system to even approve that by failure to object or to sign a permit. And there's no evidence of any permit being signed by them, nor do they have the power to do that. This is also getting into the merits, and that's fair. I actually have two minutes left, and this is a jurisdictional issue. We didn't even go to the merits. I haven't even had an opportunity after eight years in this litigation by Mr. Mosler to even argue the merits. Okay, so you raise a good point, and that's a merits point. That's not a jurisdictional point. And if I... Did you want to save your minute and a half? Yes, please. Okay, thank you. We have a watchdog here. May I actually... Let me raise one more point before I sit down and reserve a minute. You have to ask the watchdog. No, no, go ahead, of course. May I? Of course. Okay, thank you. There is a very interesting issue here. Trust funds are being used by the defense today to pay for their defense, adverse to the claims of the trust. The state of California wants to recoup a billion dollars in trust funds, but today the trust is paying the defense. We are asserting claims on behalf of the trust, and the defense is getting paid by the trust. That's improper. You cannot even raise these types of issues if you're getting paid by the trust, because the trust is essentially their client. They're getting paid by the trust. So I reserve my minute. Well, Dickens had a lot to say about that. Excuse me, sir. I just forgot about one. Good morning. Mark Harris on behalf of the City of Los Angeles, Harbor Department, Board of Harbor Commissioners, and Mr. Keller. To address the public disclosure point first, the district court was correct to dismiss the case on that basis, but I believe the court's holding was far too narrow, and, in fact, that the grounds upon which the public disclosure bar should apply were much greater than just this Exhibit 86 and Mr. Mosler's testimony before the Army Corps of Engineers. The court is correct that the allegations that were raised in that testimony were precisely those that are raised in this complaint. Would you address the specific issue that counsel has raised regarding that written testimony as to whether the hearing was a public hearing? And I think his, if I understand it, his narrow point is that unless it was orally read into the record or formally made part of the record of the public hearing, that it doesn't count as being at the public hearing. I think that's his point. Yes, and I can address that. First, in the opposition to the summary judgment, Mr. Mosler submitted that testimony along with a declaration that said it was a true and correct copy of his testimony given to the Army Corps of Engineers on that date. Well, yes, but that begs the question of given to whether it's part of the public hearing. Later, this issue of who he gave it to and when he gave it is not part of the record in this case. Okay. That was raised for the first time in a Rule 60B motion after the judgment was entered in this case and Mr. Mosler came forward with this testimony, this story, that he didn't really give it. He just handed it over to someone afterwards. So, factually, it's not part of the record and I can't really address whether he did or didn't offer that testimony before the Corps on January of 2002. I can say, however, Your Honor, that before he gave that testimony or before that incident took place, these same allegations were raised in the news meeting on several occasions in the months leading up to it. And we've cited in our brief a September of 2001 article in the Daily Breeze newspaper that discussed that port critics were complaining about the fact that the port wasn't following the plan to move the liquid bulk facilities out to Pier 400. In October 2001, Daily Breeze article suggesting that the Harbor Commission should be audited for not following this portmaster plan. In November 2001, Random Lengths article saying the same thing and saying that the port had prevaricated with respect to its conduct in building this project. There's a lengthy L.A. Times article in November 2001 that describes the entire history of the Pier 400 project, that it had originally been conceived as a project that would be used partially for liquid bulk relocation and partially as a container terminal, but that eventually it had been built as a container terminal primarily. And noting in that L.A. Times article that certain people were concerned and believed that the original plan had not been followed. In December 2001, another article along the same lines including this statement that government funds, this is an opinion piece in a newspaper article, that government funds were obtained with assurance of a transfer of infernal chemicals away from homes. It's precisely the allegations that are raised in this case were raised in those numerous articles before Mr. Mosler ever gave or didn't give or started to give his testimony in front of the Army Corps of Engineers. Let me, if I may, go back to a more fundamental point, but one that continually disturbed me as I read the briefs and now today at oral argument. What do you see as the grovelment of this complaint? That there was a lack of disclosure of congressional non-approval of the change or that from the very beginning there was in fact an intent to deceive the Congress with respect to the purpose of the appropriation. Nobody really expected or intended to build this hazardous waste facility. Your Honor, the money was obtained from Congress under a false pretext. Yes, I understand the court's question. The grovelment of this claim is what it has always been, which is, and Judge Graber referenced this in her first question, that there was a bait and switch. That the court, this is Mr. Mosler's allegation, that the court promised the Federal Government it would use Pier 400 for one purpose, but instead use it for another purpose. And it's the Paradigmatic False Claims Act case is where a government contractor says we're going to make that part out of steel and instead it makes the part out of aluminum. Or we've provided these services to the Medicare patients, but instead they've provided some other service. And so it's the classic promise one thing, deliver something else. It's not the allegation that there was not congressional authorization for the change, as Mr. Grant stated in his argument. Or as Mr. Mosler has now, they've now changed it a bit to try and get around this public disclosure point. Because as Judge Paterson notes, everybody knew. The Army Corps of Engineers was there. The newspapers were covering it. This was out in the open. Everyone knew that the project had been discussed for one thing and it evolved into something different. So that's all out there. So now we have a slight pivot by the relator here to say, well, that's not my complaint. But if you read the First Amendment complaint, and we've cited the portions of it in our public reading, that's what it's all about. It's all about this bait and switch. Promise X, deliver Y. So the focus ought to be on what, if anything, the relator found on his own. Yes. That had to do with the original bait and switch. Yes, well. Or that uncovered the bait and switch. If in fact, and that goes to the original source point. But the public disclosure is crystal clear here. Both sides of this transaction, what was promised, allegedly promised, and what was delivered, the true state of facts, disclosed for decades leading up to this lawsuit. So then we get to the, really the only issue is the one Judge Graber started with, which is, well, was he the original source of any of that? He doesn't claim anywhere that he was the original source of any of these newspaper articles that we cited that describe what happened with the court. His only claim, and the reason why there's so much time spent on this Exhibit 86, is that he argues that, well, he must have been the original source of the testimony that he gave. And on that, even that he's wrong because, as Judge Otero pointed out in the district court, to be an original source, even if you provide the testimony, you have to have direct and firsthand or direct and independent knowledge of the facts. And the cases talk about what that means to have direct and independent knowledge of the facts. It doesn't mean putting a legal name on known facts. It doesn't mean, if you're the person who observes and understands the significance of those facts, you're the first one who notices, wait a second, this might be a fraud. Am I correct in assuming that you want me to focus on what, if anything, he contributed from his own labor, from his own initiative, that was new to a disclosure of the Baden switch? Your Honor, no. I think that if the court were to take that view, it would be outside the case law and the jurisprudence, that if he contributed something to the mix, that's not good enough. So the fact that there may have been some contribution, and we see these cases where the relator gathers the publicly disclosed material. What, phrase it in your language there, what does he have to show that he hasn't shown? That he was, he has direct and independent knowledge of the facts that gave rise to these public disclosures. And he was the one who provided them. So was he a source for the newspapers that wrote about it? I want to hear there's a certain tension in the case law in the different circuits as to exactly how precise he needs to be. Well, in the Ninth Circuit, the Alcan case says that merely adding a legal name to an alleged circle of facts does not make one an original source. Or the Devlin case says it's not enough to have heard about the fraud and then pass that information on, which is what, as the Court noted, Judge Otero did find, that he heard about this, he read it in the newspapers, and he passed it on. Do you have to actually witness it? Do you actually have to have firsthand knowledge in the circuit? The cases do say that you have to have firsthand knowledge, and the Devlin case is the leading case, and Alcan is another, that you have to have knowledge of the facts obtained through your own efforts, unremediated by the efforts of anyone else. Is it fair to say the Ninth Circuit takes a fairly strict view of what you have to show? Yes, Your Honor. By comparison to its sister circuits? Well, the Second Circuit, there's a case called Gold that says relying upon information that would have been equally available to others if they had bothered to look for it is not enough, and the Ninth Circuit standard is quite similar to that. And what would you say, how would you compare it with the Seventh Circuit's jurisprudence on this? I must say, Your Honor, I'm not familiar with the leading cases in the Seventh Circuit on that point. So the court focused on this one allegation, partially because it was raised in a context of a motion for reconsideration, and the court noted that it had not properly given credence or proper attention to that fact. But there were numerous allegations raised before that Army Corps of Engineers testimony that would have satisfied the public disclosure bar or triggered the bar. There were numerous articles written for years that should have and would have satisfied the public disclosure bar with respect to the transactions. Because, of course, there can be disclosure of the allegations, which we have, or the transactions. And to get to the point that another point, Judge Ripple, you were alluding to, this issue that the fraud was in the lack of congressional intent, well, first, it's not in the complaint. It's not the allegation in the complaint. Secondly, as Judge Pragerson noted, or I read into your question, Your Honor, the Army Corps of Engineers, of course, would know not only what was happening with the project, they could see it every day, these huge piers growing up out of the harbor, but they know whether there's been congressional authorization for a change. So it can't be that the trick here was tricking the government into thinking that it itself had approved this change. That Congress had authorized the change. So it makes no sense. It's not in the complaint. And the fraud is what it's always been, promised X and delivered Y. The other issues that the court relied upon to dismiss the city defendants were the personhood under the California False Claims Act and the Federal False Claims Act. We believe, of course, correct on all of those points, with the exception of, with respect to Mr. Keller, the court did not include him in the – did not dismiss the case against him on those grounds. But he said it. If we were to agree with you and the district court on the public disclosure piece, we would not have to reach any other issues, could I? That's correct. And that's true of all defendants across the board. The court – the district court dismissed the case against all of the defendants ultimately, but each on different grounds. But one of the reasons I think it is appropriate to focus first and foremost on the public disclosure is because it does result in dismissal for all defendants in the case. Unless the court has any questions on the personhood issues or on the qualified immunity issues, I'll give the rest of my time to counsel for mayors. Very well. Thank you. Well, we need to stop the clock while she's walking up here. Thank you. Good morning. Elizabeth Beasley with Keesley Young & Logan on behalf of Defendant Maresk. For the benefit of the students in the room, Maresk is a terminal operator that operates a facility at the Port of Los Angeles. If you think of a landlord-tenant relationship, Maresk is a tenant, and the Port of Los Angeles is the landlord. We lease the facility. We're not in a position – we don't own the facility, and our business occurs on that facility like any business that you might see ongoing in any business jurisdiction, commercial area in the United States. Is Los Angeles – City of Los Angeles Harbor, is that the largest point of entry in the United States for overseas commerce shipping? Thank you, Your Honor. The City of Los Angeles and the City of Long Beach operate the Port of San Pedro or operate two ports in San Pedro Bay. San Pedro Bay serves as the fourth-largest commercial port in the world by throughput measures, and throughput is how many containers and how much movement occurs through the ports. And they provide most of the ingress of commerce which reaches the United States from the Pacific Rim. So all of your Chinese and all of your Asian imports come through San Pedro Bay. To answer Judge Graber's question as it applied to Exhibit 86 and whether the documents submitted at that hearing were in fact publicly disclosed, I would direct the court to Ninth Circuit cases A-1, Ambulance, Haygood, and Alcon. All of those cases say that any documents provided at an administrative hearing are considered publicly disclosed. And this occurs whether they are heard at the hearing, just simply whether they were provided at the hearing, they are publicly disclosed for purposes of the False Claims Act. With respect to an issue raised also by Judge Graber early on as to whether some of the findings of the fact by the district judge were clearly erroneous, the judge is correct that Judge Otero did find that Mossler was not the original source as a finding of fact in his June 5, 2009 order. I quote, as exemplified by the fact that in a number of these letters, Mossler cites media articles on Pier 400's change in use and that he did not obtain that information independently. And a review of the record confirms this. All of the disclosures by Mossler suggest that he only relied on publicly disclosed information, and that would exclude him from qualifying as an original source. One of the things that often gets confused when you're evaluating false claims is this notion of X and Y and Z and how to appropriately apply X and Y and Z, as you were raising. The district court found, critically, on a clearly erroneous standard here, the district court found that it was undisputed that the original planned use and the change in use were publicly disclosed. So that is the X and the Y, as urged by the appellees. And there is no argument that Mr. Mossler even argues that he was an original source for the court's original disclosure on how they might plan to develop this facility and their subsequent environmental impact report hearings as to how it ultimately was going to be developed. That is the X and the Y. And with just finding and affirming the district court on those factual findings is sufficient. The Z. You need not show that the X involved a deceptive intent. That's correct. A deceptive intent is not required. What's the authority for that? I will get that for you. The deceptive intent, it is of, I think it's A1 Ambulance, but I'll get that for you, which says that it is of no legal moment that the disclosures point, do not point to fraud. That the fact, the threshold inquiry is whether it's enough to put the government on notice to commence an investigation. So it's only the facts that need to be disclosed. It's A1 Ambulance that says that it is of no legal moment that it doesn't point to the fraud, because all you need are the factual allegations. It's the Z, Your Honor. It's the Z that's the part of the equation, which is the allegation of fraud. So you can affirm the district court on the X and the Y, which are the two facts that the district court found, which is original plan, change in use, or you can find on the Z, which is the allegation of fraud. And the allegation of fraud is exemplified in the, where, of course, there's no fraud, but the allegation of fraud, which Mr. Mosler urges, is found in his testimony, the bait and switch testimony, as Exhibit 86. So in this case, we have a unique situation where the court can affirm on X and Y, and it can't affirm on Z, because it's an or. The public disclosure bar exists if we show X and Y or Z. Here, we've shown them all. So the public disclosure bar applies in both scenarios, and the district court can be affirmed on both scenarios. There's two other findings of facts that I would like to raise for the court that were made by the district judge before I take a seat, and those are, and I appreciate Judge Graber's comment that if we prevail on subject matter jurisdiction, we don't need to reach the other immunity issues. But in contrast to what Mr. Grant said, when the court was investigating the qualified immunity application of Mr. Keller, it did test the sufficiency of the case. It did test the sufficiency of the pleadings. He did evaluate the record. And what did he find? What factual findings did he make? He made two very critical factual findings. He found that Larry Keller, the executive director, the spokesperson for the court of Los Angeles, that there was not sufficient evidence that he knowingly submitted a false claim. He made that finding. He also made a finding that the documents provided to the Army Corps of Engineers didn't require a liquid-bulk facility. He found no clear evidence of a false claim. What else did he find? The final thing he found, the first amended complaint does not even allege that my client, Maris, had any role in securing federal funding for this project. So we have the port of Los Angeles, the spokesperson for the port of Los Angeles, factual finding, weighing the evidence, no false claim. We have the project documents that were submitted to the Army Corps of Engineers which did not compel the port to develop it as a liquid-bulk facility. Indeed, he quotes in that order that the port could be flexible and develop the facility as to future needs of the tenant. And he found the first amended complaint had no false allegations, stated no allegations against my client, Maris. This Court can affirm, as I'm sure it knows, on any basis supported by the record. I submit to this Court that this Court can affirm on subject matter jurisdiction finding the X and Y were disclosed and Mosler was not the original source. It can affirm on Z, the allegation of fraud, Mosler was not the original source. And it can find that as a matter of fact, the district court, when you distilled the factual findings in both of these orders, reached on a clearly erroneous standard that there is not sufficient evidence to show any fraud on the part of any of the defendants, much less Maris. I thank you. Thank you. Just a matter of curiosity. How is this toxic bulk a matter being handled at the court? The liquid-bulk facilities, and they're not necessarily toxic. I know that. I knew that when I said it. Yes, that's okay. Back in 1983, when there was a lot of concern about the storage of liquid-bulk facilities being closed to neighborhoods, there was an undertaking to try to relocate these liquid-bulk facilities so that they didn't present a danger to neighborhoods. Since the time of that initial thought, there have been great technological improvements in the manner in which liquid-bulk is stored. And so the liquid-bulk facilities, as they exist currently, do not provide the danger to the neighborhoods that it was suggested they provided before. So 15 acres of Pier 400 right now will be leased for liquid-bulk, so there is a portion of Pier 400 which will be leased for liquid-bulk. It's currently being developed now. But at the moment, they call them tank farms. You've probably heard that phrase before. They're giant tanks which are set in the ground. Those tank farms have been consolidated, and they do not pose the danger. Instead of setting them up on the hills and ground around the quarry. That's exactly right. Okay? All right. Thank you. Thank you very much. I may have more than 56 seconds for rebuttals since they went 7 1⁄2 minutes over. I appreciate it. There's some important issues, and I will be brief, and I try not to sound like a chipmunk. Justice Ripple, you asked what's the nature of the fraud. It's not bait and switch. That's the result. That's out there in the public. They were going to do this, and they did that. That's out there. This is a False Claims Act case. What were the claims false when submitted for the money? What were they submitted for? They were submitted for an authorized project that, according to the master plan, the Port Master Plan, required 195 acres for liquid bulk disposal. That never changed. They never went back to Congress and said, you know what? Technological advancements don't require it anymore. Everyone's safe in their homes. You don't need it. Market has changed. Whatever. We're going to do what we want. That's not the law. Bottom line, the agreements, underlying agreements, that actually implemented this project required compliance with federal law. And in particular, they're basically creating easement in federal waterways. So Section 403 of the Rivers and Harbors Act says, the creation of any obstruction not affirmatively authorized by Congress to the navigable capacity of any of the waters of the United States is prohibited. So they built this island that Congress never authorized. And they can't just say, no one objected, or we put it out there in the newspapers. That's not okay. This is a false claim to that case. When they asked for the money, the billion dollars in trust funds and the $100 million in federal funds, their only basis for asking for a dime of that was to build this authorized project. It was approved by Congress after investigations and feasibility studies and years and years of work. It was never changed. It never went back to Congress. No Congress approval. They basically are violating the navigational servitudes, both federal waters and state waters. Newspaper articles are not at issue. They best talk about the bait and switch. You've got to get back to what did your client contribute? What was your client's contribution that nobody else made? He dug into non-publicized records. He went and looked at the project cooperation agreement. He went and looked at all the amendments to the portmaster plan. He saw that Congress required 195 acres of liquid disposal. He went in and found the nuts of the falsity. Now, there was a deception here. They had a great public relations campaign. It was basically fraud in broad daylight. We're not doing anything wrong. We're doing it on the open. It's all in the papers. We're doing what we're doing. It's for the benefit of everybody. But the bottom line is it's undisputed. They never got the necessary approvals from Congress as required in the contracts through which they're building this island. That is what my client contributed. That's what Mr. Mosser, through tenacious, time-consuming work, found, that they were violating, that they never got the congressional approval. And he didn't even say any of that to the Army Corps of Engineers. That's not in his public testimony during that hearing. So the core of the fraud and of the false claim was never spoken in the public, in the newspaper or before the Army Corps of Engineers. In other words, he did his own detective work, read all these papers and talked to people and then came to the conclusion that this fraud was being perpetrated on the government and it was only in the result of his research and his efforts and his drive and his determination that this came up, right? Yes, and he's not putting a label on it. He's not just merely putting a label on this bait and switch. He's found the nut. Yeah, we understand. We got you down to the nuts and bolts. Thank you. Thank you, Your Honor. Thank you. All right. Okay. But, you know, you've got to wrap this up. I'm wrapping it up. I'm wrapping it up. I'd like to go quickly to this arm of the state. The principal basis for ruling that they were arm of the state, the city defense were arm of the state and, therefore, not persons under the False Claims Act, was that a judgment against them would be paid by the exact same trust funds that they misappropriate $100 billion of. That is nonsense. It violates the probate code, California probate code. It violates the certificate of authority, which is attached to the project cooperation agreement that says the city will pay damages if it's not complying with federal law. Okay. I think we got all this now from you. It's all in your briefs, right? Yes, Your Honor. Thank you very much. Thank you. That's it. We appreciate the argument. And, you know, I'll suggest this. If the professor from Pasadena Community College wishes, that the three of you might stay here and talk to the students. And I'm particularly interested, well, in the men, too. But the future of this country belongs to the women. You understand that, huh? Once you understand that, you'll be in good shape. And, you know, we have fine lawyers here. We have a wonderful example of an excellent woman advocate. And she probably at one time in her life was a schoolteacher. And were you? I was a paralegal. Well, you see, oh, you were a paralegal? Yes, sir. No, no. I had one of my early law clerks started out as a secretary in a firm and then was a paralegal and then figured that she was smarter than the lawyers. So she went to UCLA Law School and was number one in her class and entered her in chief of the law review and then came to work for me. And now she's the dean of students at UCLA Law School. So things have changed. When I went to law school, there were only three women in our class. But as I say, you're the future. So do you mind talking to them? You're a paralegal? They'll probably get extra grade points for that. Okay. All right. Thank you. We'll be back. Thank you. All rise.
judges: Pregerson, Ripple, Graber